Aaron C. Garrett (UT Bar #12519)
Executive Director
NONPROFIT LEGAL SERVICES OF
UTAH
623 East 2100 South, Suite B1
Salt Lake City, UT 84106
(385) 419-4111
aaron@nonprofitlegalservices.com

Nathaniel Shoaff (admitted *pro hac vice*)
Senior Attorney
SIERRA CLUB ENVIRONMENTAL LAW
PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org

*Attorneys for Plaintiff Sierra Club*

Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS
ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
landon@suwa.org

Melissa Hornbein (*pro hac vice* pending)
Barbara Chillcott (*pro hac vice* pending)
WESTERN ENVIRONMENTAL LAW
CENTER
103 Reeder's Alley
Helena, MT 59601
(406) 430-3023
hornbein@westernlaw.org
chillcott@westernlaw.org

*Attorneys for Plaintiff Southern Utah
Wilderness Alliance*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **SIERRA CLUB** and **SOUTHERN UTAH WILDERNESS ALLIANCE**,<br><br>      Plaintiffs,<br><br>v.<br><br>**KENT HOFFMAN**, in his official capacity as Deputy State Director, Division of Lands and Minerals, Utah State Office, U.S. Bureau of Land Management**; U.S. BUREAU OF LAND MANAGEMENT**; and **U.S. DEPARTMENT OF THE INTERIOR**,<br><br>      Defendants. | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 4:22-cv-00037-PK<br><br>Magistrate Judge Paul Kohler |

## INTRODUCTION

1.      This lawsuit challenges a decision by the United States Bureau of Land Management ("BLM"), United States Department of the Interior, and Kent Hoffman, in his official capacity as Deputy State Director, Division of Lands and Minerals, Utah State Office, BLM (collectively, "Federal Defendants") to expand the size, and thereby the life, of the Lila Canyon coal mine ("Mine"). The Mine and the lease expansion areas at issue in this lawsuit are located less than a quarter mile from the Turtle Canyon Wilderness and along the western slope of Utah's wild Book Cliffs region. For the reasons set forth below, Federal Defendants' approval of the lease expansion was arbitrary and capricious, contrary to law, and in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.

2.      The Decision Record ("DR") for the Lila Canyon Mine Lease Modifications Environmental Assessment ("EA") was approved on January 5, 2021, in the waning days of the prior presidential administration. The decision expanded the existing mine lease into an additional 1,272 acres of publicly-owned lands and minerals managed by the BLM.

3.      The lease expansion will extend the life of the Mine by a minimum of two to three years, and allows for the extraction of an additional 7.2 million tons of salable coal. The anticipated mining activity will emit 11.4 million tons of greenhouse gas ("GHG") emissions annually, further exacerbating the ongoing climate crisis, and by association the decades-long drought in this region.

4.      The Federal Defendants' DR and EA violated NEPA for three reasons. First, the EA analyzed just two polar opposite alternatives and ignored other reasonable, middle-ground,

alternatives that would have satisfied the agencies' broad statutory mandates as well as the stated objectives for the proposed action. Second, the EA provides an economically skewed analysis—touting purported economic benefits of expanding the leases, while ignoring the socioeconomic and environmental costs of mining the additional coal. Third, the EA failed to analyze the short- and long-term impacts of increased methane emissions by ignoring the best available scientific data and methods regarding the significant climate warming potential of this potent GHG.

5.      Accordingly, Plaintiffs the Sierra Club and Southern Utah Wilderness Alliance seek a declaration that Federal Defendants' decision to select the proposed action and allow the lease modifications was arbitrary, capricious, and contrary to law, in violation of NEPA and the APA.

## JURISDICTION AND VENUE

6.      This Court has federal-question jurisdiction over this action, 28 U.S.C. § 1331, which arises under the APA, 5 U.S.C. §§ 705, 706.

7.      The requested declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2201, and 5 U.S.C. §§ 705, 706.

8.      Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issue are situated in this district.

9.      Plaintiffs have standing under Article III of the U.S. Constitution because the challenged actions cause their members recreational and aesthetic harm, which will be remedied by a favorable ruling from this Court.

10.     The challenged actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, 706.

11.     Plaintiffs have exhausted any and all available and required administrative remedies.

## PARTIES

12.     Plaintiff SIERRA CLUB is a national non-profit organization with 64 chapters nationwide, including in Utah, dedicated to exploring, enjoying, and protecting the wild places of the earth; to protecting and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass the exploration, enjoyment, and protection of the lands, water, and air in Utah.

13.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("SUWA") is a non-profit environmental membership organization dedicated to the preservation of the outstanding wilderness found throughout Utah and the management of wilderness-quality lands in their natural state for the benefit of all Americans. SUWA is headquartered in Salt Lake City, Utah. SUWA members use and enjoy public lands throughout Utah for a variety of purposes, including recreation, wildlife viewing, cultural appreciation, and aesthetic appreciation. SUWA promotes local and national recognition of the region's unique character through research and public education and supports administrative and legislative initiatives to permanently protect Utah's wild places.

14.     Members and staff of Plaintiffs' organizations regularly use and enjoy public lands near the Mine expansion for a variety of purposes, including hiking, recreation, photography and aesthetic appreciation of the surrounding area's natural and wild values; and intend to continue doing so. For example, members of Plaintiffs' organizations have visited the Lila Canyon area prior to the Mine's existence, have spent considerable time visiting and working to protect the lands impacted by the Mine, and have hiked in Lila Canyon (prior to the Mine's existence) and on nearby public lands along the western escarpment of the Book Cliffs (after the Mine activities began) from which they could see the Mine and the lands impacted by the approved expansion.

15.     Plaintiffs' members and staff also frequently recreate in the San Rafael Swell, located downwind from the nearby Hunter Power Plant and Huntington Power Plants in Emery County, Utah, engaging in camping, hiking, wilderness photography, scenic driving, and professional activities; and intend to continue doing so. According to Federal Defendants, these power plants are where the majority of coal extracted from the Mine will be shipped and combusted. Burning coal at these power plants detrimentally impacts scenic enjoyment by Plaintiffs' members by creating air pollution and consequently decreasing the visibility of the unique San Rafael Swell landscape.

16.     For these reasons, Plaintiffs' members and staff desire to protect the scenery, air quality, and other aesthetic and natural values of the Mine area, the Book Cliffs, and the San Rafael Swell from the direct, indirect, and cumulative impacts of the Mine so that they can continue to enjoy these activities without hindrance. They desire to continue to use and enjoy the affected areas without, for example, breathing the polluted air that would result from the Mine

expansion and associated coal combustion; driving on roads near the Mine and power plants that would be impacted by increased (and/or continued) coal truck traffic; or experiencing and photographing wilderness vistas through diminished visibility.

17.     The Federal Defendants' decision to expand coal mining onto adjacent, publicly-owned lands will thus irreparably harm Plaintiffs' health, recreational, professional, and aesthetic interests and the interests of their members. The increased mining activity, coal production, and GHG emissions resulting from the expansion will cause immediate, as well as sustained and prolonged damage to the environment. This will impair Plaintiffs' members' enjoyment of these public lands, as well as adjacent public lands. The declaratory and injunctive relief sought herein will redress these harms.

18.     Defendant KENT HOFFMAN is sued in his official capacity as Deputy State Director, Lands and Minerals, of BLM's Utah State Office. Deputy State Director Hoffman is responsible for overseeing Utah BLM's minerals program, including mineral activities within the jurisdiction of the Price Field Office, where the Lila Canyon Mine is located. He signed the NEPA documents approving the lease modifications allowing the Mine expansion at issue in this litigation.

19.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal agency responsible for protecting and managing much of this country's natural resources, public lands, and cultural heritage. The Department of the Interior is responsible for ensuring that agencies within the Department manage the nation's public lands in accordance with federal laws, including NEPA.

20.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is a federal agency within the Department of the Interior that is responsible for the management of more than 245 million acres of public lands in the United States and nearly 700 million acres of federal subsurface mineral estate.

## LEGAL FRAMEWORK

### Administrative Procedure Act

21.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*

22.     Pursuant to the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

### National Environmental Policy Act

23.     NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] NEPA has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to

---

[1] On September 14, 2020, the Council on Environmental Quality revised the NEPA regulations. *See generally* 85 Fed. Reg. 43304 (July 16, 2020). However, The EA, DR, and Finding of No Significant Impact ("FONSI") at issue here were prepared subject to the NEPA regulations in effect prior to September 2020. All citations to the NEPA regulations in this Complaint are to the pre-September 2020 version of the regulations.

ensure that agencies inform the public that they have considered environmental concerns in their decision making. *See id.* § 1500.1(c).

24.     NEPA achieves its purpose through action forcing procedures that require agencies to take a hard look at environmental consequences of their actions and authorizations.

25.     NEPA require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

26.     Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. § 1501.2.

27.     To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS") must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. § 1502.14.

28.     An agency may also prepare an EA to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9. NEPA's requirement to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources ...” is independent of whether an agency prepares an EA or EIS. 42 U.S.C. § 4332(E).

29.     If an agency decides not to prepare an EIS, an EA must “provide sufficient evidence” to support a FONSI. *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action “will not have a significant effect on the human environment.” *Id.* § 1508.13.

30.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action. *Id.* §§ 1508.7, 1508.8.

31.     Direct impacts are those impacts “caused by the action and [that] occur at the same time and place.” *Id.* § 1508.8(a).

32.     Indirect impacts are “caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.” *Id.* § 1508.8(b).

33.     Cumulative impacts are “the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.” *Id.* § 1508.7.

## FACTUAL BACKGROUND

### The Lila Canyon Mine Lease Modifications

34.     The Lila Canyon Mine is an underground coal mine located in along the western edge of the scenic Book Cliffs of eastern-central Utah, less than a quarter mile from the Turtle Canyon Wilderness.

35.     BLM has described the public lands adjacent to and near the Lila Canyon Mine,

including Turtle Canyon, as containing "outstanding scenic quality." In addition, "[t]here are

populations of mountain lion, elk, Rocky Mountain bighorn sheep, and black bear. . . . Overall,

the differences in terrain and vegetation and the variety of wildlife and wildlife habitat that exist

here are seldom found in an area the size of the Turtle Canyon [region]."

36.     From 2009 to 2020, the Mine produced over 14.3 million tons of coal.[2] Most of

the coal produced at the Mine is shipped to and combusted at the nearby Hunter Power Plant in

Castle Dale, Utah and Huntington Power Plant in Huntington, Utah.

37.     The approved expansion added 1,272 acres of publicly-owned lands and minerals

to the existing Mine, in two different areas (317 acres and 954 acres, respectively). It will

provide for the extraction of an estimated additional 7.2 million tons of coal, extending the life of

the Mine by at least two to three years.

---

[2] U.S. Energy Information Administration, Coal Data Browser, Lila Canyon, Annual,
https://www.eia.gov/coal/data/browser/#/mine/4202241/?freq=A&pin= (last visited July 7,
2022).



Proximity of the Mine's current and proposed lease area to
the Turtle Canyon Wilderness Area (created by BLM. *See* EA at 21)

38.     The Mine's expansion based on these parameters and expectations constitute the proposed action analyzed in the EA at issue.

### Deficiencies in the EA

39.     Pursuant to NEPA, Federal Defendants conducted an environmental review of the proposed Mine expansion, which included a draft EA released in October 2020, and a final EA released in January 2021, with the stated purpose of analyzing the site-specific impacts of the proposed action and its alternatives.

40.     Federal Defendants solicited public comments on the draft EA. Plaintiffs, together with other commenters, submitted comments identifying numerous concerns with the proposed Mine expansion, including the legal deficiencies at issue in this litigation.

41.     Upon issuing the final EA, Federal Defendants also released the corresponding FONSI and DR, selecting the proposed action alternative and finding that "the project is not a major federal action and will not significantly affect the quality of the human environment, individually or cumulatively with other actions in the general area." FONSI at 2. Federal Defendants swept aside Plaintiffs' concerns as lacking merit.

### *Lack of a Reasonable Range of Alternatives*

42.     The draft EA explained that the "purpose of the federal action is to respond to [the company's] application to expand two existing leases to add new federal coal reserves on 1,272.64 acres." Draft EA at 5. The draft EA continued that the "need for the action is established by BLM's responsibility under the Mineral Leasing Act of 1920, [its amendments], and the Federal Land Policy and Management Act … which states that the public lands shall be managed in a manner that recognizes the nation's need for domestic sources of minerals." *Id.*

43.     Despite this broadly stated purpose and need, the draft EA analyzed just two polar opposite alternatives: the proposed action (i.e., approve both expansion areas in their entirety) and the NEPA-mandated "no-action alternative" (i.e., deny the Mine expansions).

44.     In their comments, Plaintiffs recommended middle-ground alternatives that would have satisfied the stated objectives for the proposed action and were within Federal Defendants' broad statutory mandates. This included alternatives that would have limited the size of the Mine expansion and/or required implementation of methane emissions reduction strategies (beyond those considered in the proposed action alternative).

45.     Federal Defendants did not analyze Plaintiffs' middle-ground alternatives in the final EA. They explained that they did not consider Plaintiffs' "moderate expansion" alternative because it would not allow for the maximum recovery of the coal resource. EA at F-14. And they explained that they did not analyze Plaintiffs' "methane emissions reduction" alternative because "[m]ethane has been measured as undetectable at the Lila Canyon Mine vents." *Id.*

46.     These rationales are inconsistent with Federal Defendants' stated purpose and need for the proposed action and/or are factually inaccurate and otherwise contradicted by data presented in the EA.

*Economically Skewed Analysis*

47.     In the final EA, Federal Defendants acknowledged that GHGs such as carbon dioxide ($CO_2$) and methane ($CH_4$) emitted due to coal combustion at the Mine contribute to global climate change. EA at 30-31, 38-40. Specifically:

a. "Because GHGs circulate freely throughout Earth's atmosphere, climate change is a global issue. The largest component of global anthropogenic GHG emissions is $CO_2$ . . . . Fossil fuel use is the primary source of global $CO_2$." *Id.* at 31.

b. "Between 2017 and 2018, the increase in total GHG emissions was largely driven by an increase in $CO_2$ emissions from fossil fuel combustion." *Id.*

c. "Methane emissions account for nearly 10% of [GHG] emissions." *Id.*

d. "When combusted at a power plant, the coal mined…would indirectly contribute to…GHG, and other toxic air pollutant emissions." *Id.* at 37.

48.    The above-described global climate change impacts impose economic costs on society. There are several scientifically accepted approaches for estimating those costs and evaluating the impacts of GHG emissions. One such method is the Social Cost of GHGs, including the Social Cost of Carbon and Social Cost of Methane protocols, which estimates the economic damage caused by $CO_2$ and $CH_4$, respectively. These protocols have been previously used by federal agencies to estimate the climate costs of rulemakings and project-level decisions, and agencies may also use alternative methodologies to quantify the costs and impacts of GHG emissions.

49.    Based on 4.5 million tons of coal combusted per year, the final EA estimated that the proposed action alternative would release 11,283,637 tons of $CO_2$ emissions and 2,927 tons of $CH_4$ emissions per year. EA at 37-38.

50.    Notwithstanding its quantification of the GHG emission volume associated with the Mine, Federal Defendants refused to quantify or analyze the costs and impacts to society from those emissions. *See id.* at 47-49.

51.     This failure skewed the Federal Defendants' analysis, placing their thumb on the scale in favor of the purported economic benefits of the Mine expansion, while ignoring the societal and environmental costs of large-scale coal mining. For example, Federal Defendants highlighted what they labeled "socioeconomic" benefits such as positive employment statistics and mine-related revenues. *Id.* at 54. In contrast, Federal Defendants did not quantify or analyze the environmental and societal costs and impacts from the GHG emissions that will occur when the coal is extracted and burned.

*Underestimating Methane Emissions*

52.     Fossil fuel extraction and combustion, including coal mining, is one of the largest sources of methane emissions in the United States.

53.     Global warming potentials ("GWP") are quantitative multipliers used to standardize the heat-trapping characteristics of each GHG in comparison to carbon dioxide, which has a GWP of 1 and is considered the baseline. Scientists and federal agencies identify the warming potentials of GHGs in terms of a Carbon Dioxide Equivalent ("$CO_2e$"). For a specific quantity of each GHG, the corresponding $CO_2e$ value denotes the amount of $CO_2$ which would have an equivalent warming impact. A quantity of a GHG can be expressed as $CO_2e$ by multiplying the amount of the GHG by its GWP.

54.     Methane is a particularly potent GHG that traps much more heat per ton than that of carbon dioxide. Scientists and federal agencies commonly analyze methane's GWP over both 20-year and 100-year periods. According to the IPCC's most recent report, methane from fossil fuel sources is 84-87 times more potent than carbon dioxide over a 20-year period (methane's 20-year GWP) and 28-36 times more potent over a 100-year period (methane's 100-year GWP).

55. In the final EA, Federal Defendants calculated the total $CO_2e$ for all of the analyzed GHG emissions using the 100-year GWP for each pollutant, and expressly stated that methane's GWP was 28, the low end of the 100-year GWP range. *See* EA at 34, 38. Federal Defendants failed to disclose methane's specific $CO_2e$ value using the 100-year GWP, which would be at least 81,956 tons per year, based on the proposed action's estimated annual methane emissions (2,927 tons per year).

56. Federal Defendants also entirely failed to utilize and disclose the proposed action's $CO_2e$ value for methane based on the 20-year GWP. They ignored accurate and best available scientific data indicating that methane's atmospheric lifetime (i.e., the duration in which methane remains in the atmosphere) is only 12-15 years, while carbon dioxide remains in the atmosphere for 300-1000 years. Thus, the 20-year GWP for methane is a much more accurate calculation of methane's $CO_2e$. Using the 20-year GWP value of 87, the annual $CO_2e$ for methane released by the proposed action is 254,649 tons per year; more than triple the amount estimated by Federal Defendants in the EA.

### FIRST CAUSE OF ACTION

*NEPA Violation: Failure to Analyze a Reasonable Range of Alternatives*

57. Plaintiffs incorporate by reference all preceding paragraphs.

58. Pursuant to NEPA, Federal Defendants must analyze a range of reasonable alternatives in EAs. 42 U.S.C. §§ 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b). An alternative is reasonable if it satisfies two criteria: First, it falls within the agency's statutory mandate. Second, it satisfies the agency's stated purpose and need for the proposed action. *See, e.g.*, *High Country*

*Conserv. Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1224 (10th Cir. 2020); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009).

59.     The federal laws governing the proposed action provide broad statutory mandates, including the Mineral Leasing Act of 1920 and its amendments and the Federal Land Policy and Management Act of 1976. In the EA, Federal Defendants established an exceedingly broad purpose and need for the proposed action—that is, to "expand" the existing Mine leases and to manage the public lands "in a manner that recognizes the nation's need for domestic sources of minerals."

60.     Plaintiffs specifically proposed middle-ground alternatives that fell within the Federal Defendants' broad statutory mandates and would have satisfied the stated purpose and need for the proposed action: a "moderate expansion" alternative and a "methane emissions reduction" alternative.

61.     Nonetheless, Federal Defendants analyzed just two polar opposite alternatives: the proposed action (approve both lease modifications in their entirety) and the no-action alternative (deny both lease modifications).

62.     Federal Defendants' failure to analyze a reasonable range of alternatives, including the middle-ground alternatives recommended by Plaintiff, violated NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.9(b). BLM's decision was thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA, 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION

*NEPA Violation: Failure to Take a Hard Look at the Indirect Effects of GHG Emissions*

63.    Plaintiffs incorporate by reference all preceding paragraphs.

64.    NEPA requires federal agencies' environmental analyses to consider "*any* adverse environmental effects which cannot be avoided." 42 U.S.C. § 4332(2)(C)(ii) (emphasis added). Federal agencies must "identify and develop methods and procedures … which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations." *Id.* § 4332(2)(B).

65.    NEPA requires federal agencies, including Federal Defendants, to take a "hard look" at the indirect impacts of proposed major federal actions. 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. § 1508.25(c)(2). Federal regulations define impacts or effects under NEPA to include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health. 40 C.F.R. § 1508.8.

66.    Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." *Id.* § 1508.8(b).

67.    Federal Defendants quantified the purported economic benefits of the Mine lease modifications using, among other factors, dollar values and employment statistics, but declined to use any method to quantify the climate change impacts of GHG emissions from the extraction and combustion of coal from the Mine, thus effectively estimating these impacts at zero.

68.     This failure by Federal Defendants to take a "hard look" at the indirect impacts, including socioeconomic and environmental costs, of GHG emissions resulting from additional coal mining and combustion violates NEPA and its implementing regulations. 42 U.S.C. § 4332(2); 40 C.F.R. § 1508.25(c)(2). Federal Defendants' decision was thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA, 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**

*NEPA Violation: Failure to Take a Hard Look at Methane Emissions*

69.     Plaintiffs incorporate by reference all preceding paragraphs.

70.     NEPA requires federal agencies to take a "hard look" at the potential impacts before committing "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1508.9, 1508.25.

71.     When analyzing the environmental impacts, including "any adverse environmental effects which cannot be avoided," 42 U.S.C. § 4332(2)(C)(ii), agencies must investigate and explain "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." *Id*. § 4332(2)(C)(iv).

72.     NEPA requires agencies to examine both the short- and long-term effects of a proposed action and its alternatives. 40 C.F.R. § 1508.27(a).

73.     Federal Defendants failed to take a "hard look" at methane emissions projected under the proposed action. By solely relying on the low end of the 100-year GWP range for methane, despite being aware of the scientific relevance, significance, and usage of the 20-year

19

GWP, Federal Defendants failed to analyze both the short- and long-term effects of the projected methane emissions. Consequently, Federal Defendants significantly underestimated the impacts of methane emissions.

74.    Federal Defendants' failure to take a hard look at methane emissions is arbitrary, capricious, an abuse of discretion, and contrary to NEPA, 42 U.S.C. § 4332(2)(C)(ii), its implementing regulations, and the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgement in their favor and against Federal Defendants and provide the following relief:

1.    Declare that Federal Defendants' actions violate NEPA, the regulations and policies promulgated thereunder, and the APA;

2.    Vacate and set aside the EA, FONSI, and DR;

3.    Enjoin Federal Defendants from re-issuing or approving the lease modifications and DR until Federal Defendants have demonstrated compliance with NEPA and the APA;

4.    Order Federal Defendants to inform the lessee that the approval of the lease modifications has been vacated and that mining operations in the modification areas cannot take place until Federal Defendants comply with their obligations under NEPA and the APA;

5.    Retain continuing jurisdiction over this matter until Federal Defendants fully remedy the violations of law complained of herein;

6.    Award Plaintiffs the costs they have incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and

7.      Provide such other relief as the Court deems just and proper.

Respectfully submitted this 12th day of July, 2022.

  /s/ Aaron C. Garrett
Aaron C. Garrett (UT Bar #12519)
NONPROFIT LEGAL SERVICES OF UTAH
623 East 2100 South, Suite B1
Salt Lake City, UT 84106
(385) 419-4111
aaron@nonprofitlegalservices.com

Nathaniel Shoaff (admitted *pro hac vice*)
Senior Attorney
SIERRA CLUB ENVIRONMENTAL LAW
PROGRAM
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org
*Attorneys for Plaintiff Sierra Club*

Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
landon@suwa.org

Melissa Hornbein (*pro hac vice* pending)
Barbara Chillcott (*pro hac vice* pending)
WESTERN ENVIRONMENTAL LAW CENTER
103 Reeder's Alley
Helena, MT 59601
(406) 430-3023
hornbein@westernlaw.org
chillcott@westernlaw.org
*Attorneys for Plaintiff Southern Utah Wilderness
Alliance*

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that on this 12th day of July, 2022, a true and correct copy of **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** was served on the following in the manner and to the address indicated below:

| | |
|---|---|
| ___ US MAIL<br>___ CERTIFIED MAIL<br>___ OVERNIGHT MAIL<br>___ FACSIMILE<br>_x_ GREEN FILING/ECF<br>___ EMAIL | SNELL & WILMER LLP<br>Denise A. Dragoo<br>Paul W. Shakespear<br>15 W SOUTH TEMPLE STE 1200<br>SALT LAKE CITY, UT 84101<br>Tel: 801-257-1998<br>ddragoo@swlaw.com<br>pshakespear@swlaw.com<br><br>James P. Allen<br>ONE S CHURCH AVE STE 1500<br>TUCSON, AZ 85701<br>Tel: 520-882-1287<br>jpallen@swlaw.com<br>*Attorneys for Proposed Intervenor Emery County Coal Resources* |

 /s/ Aaron C. Garrett
Aaron C. Garrett